IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | I N F O R M A T I O N |
| | ) | |
| | ) | Case No. _1:12-cr-172-01_ |
| v. | ) | _-02_ |
| | ) | Violations:   18 U.S.C. § 1349 |
| SCOTT N. POWERS | ) | |
| DAVID E. McMASTER | ) | |
| | ) | |

The United States Attorney Charges:

**Introductory Allegations**

At all times material to this Information:

1.      Defendant SCOTT N. POWERS was the chief executive officer ("CEO") and president of American Mortgage Specialists, Inc. ("AMS"). The ownership of AMS was held nominally in the name of his spouse. SCOTT N. POWERS effectively controlled all aspects of AMS.

2.      Defendant DAVID E. McMASTER was the vice president in charge of lending operations at AMS.

3.      AMS, an Arizona corporation headquartered in Mesa, Arizona , was in the business of originating residential real estate mortgage loans to borrowers in Arizona and other states and then selling the loans to institutional investors, including J.P. Morgan Chase and Wells Fargo.  AMS obtained funding for the loans by selling participation interests in the loans to financial institutions, including BNC National Bank ("BNC") .

4.      BNC was a national bank with headquarters in Bismarck, North Dakota and had offices in several states, including Arizona.   BNC was a member of the Federal Home Loan Bank

of Des Moines, one of twelve regional banks established by Congress to support mortgage lending. BNC's deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"). In January 2009, BNC's holding company received approximately $20,000,000 in federal funds under the Troubled Asset Relief Program ("TARP") and approximately $17,000,000 of the TARP funds were subsequently injected into BNC by the holding company.

5.     On or about October 30, 2006, BNC entered into a loan participation agreement with AMS to provide funding for loans originated by AMS. BNC was a 100 percent participant in any loan in which it participated under the agreement, that is, BNC provided all of the funding for the loan. The maximum principal amount outstanding on the aggregate of all loans at any time during the participation term was initially $25 million and rose to $27.5 million in a subsequent agreement. Under its agreements and understandings with AMS, BNC could require AMS to repurchase loans when the loans did not sell by the loan maturity date and if AMS did not get an extension.

6.     AMS was required by its agreements and understandings with BNC to provide financial information to BNC, including periodic financial statements, and AMS was required to maintain certain minimum tangible net worth and to meet certain financial ratios. AMS was also required by its agreements and understandings with BNC to disclose any change in the status of the loan collateral.

7.     BNC provided funding for each loan via a wire of funds from a "funding" account at BNC in Bismarck, North Dakota. When loans were sold to investors, the funds were to be wired from the investors, often bundled together as one wire for several loans purchased, to a "purchase" account held at BNC in North Dakota. AMS was to send a "pay down" email to BNC notifying it of the sales. The pay down emails provided the AMS loan number, the borrower's name, and the

2

amount of the funds wired by investors for the loan purchase. BNC used the "pay down" information to calculate the loan participation principal, interest and fees owed to BNC and to calculate additional amounts where a loan sale was insufficient to cover amounts due from AMS.

8.      Based in part on the pay down emails AMS sent to BNC which identified loans that had been sold to investors, BNC sent monthly reports to AMS providing a list of loans that BNC understood were outstanding loans held for sale.   BNC also at times sent inquiries to AMS requesting information about the older loans held for sale as shown in the list and received in responses from AMS purporting to explain the delay in sales. BNC continued to fund millions of dollars of new loans, including hundreds of thousands of dollars in loans to SCOTT N. POWERS and DAVID E. McMASTER, under the belief that AMS' financial condition was sound as shown in the AMS financial statements, that BNC was timely being repaid on loans that had sold, and that approximately $25 million to $27 million in loans funded by BNC remained for sale.

9.      On or about April 21, 2010, a BNC employee visited an AMS office and obtained an internal AMS computer printout showing that only a handful of loans actually remained to be sold. The printout revealed that approximately $565,000 of loans remained to be sold, rather than the approximately $27 million of loans which were shown in BNC records as being held for sale to investors. BNC ceased funding the loans, and AMS closed its operations. Subsequently, a receiver was appointed for AMS.  BNC incurred losses exceeding the millions of dollars that BNC had received from TARP, and BNC did not then make its required TARP dividend payments to the United States Department of Treasury between February 2010 and December 2011.

## Conspiracy to Commit Bank Fraud and
## Wire Fraud Affecting a Financial Institution

10.     From at least in or about October 1, 2007, an exact date unknown, and continuing

until in or about April 30, 2010, in the District of North Dakota and elsewhere, defendants

SCOTT N. POWERS and DAVID E. McMASTER

knowingly and willfully combined, conspired, confederated, and agreed with each other and with

persons known and unknown to commit offenses against the United States in violation of Title 18,

United States Code, Section 1349, that is: (i) Bank Fraud, in violation of Title 18, United States

Code, Section 1344, by executing and devising a scheme and artifice to defraud BNC National Bank,

a national bank and financial institution whose deposits were insured by the Federal Deposit

Insurance Corporation, and to obtain any of the moneys, funds, credits, assets, securities and other

property under the custody and control of that financial institution, by means of false and fraudulent

pretenses, representations, and promises; and (ii) Wire Fraud, in violation of Title 18, United States

Code 1343, affecting a financial institution, by executing and devising a scheme and artifice to

defraud BNC National Bank and to obtain money and property by means of materially false and

fraudulent pretenses, representations and promises, knowing that they were false and fraudulent

when made, and transmitting and causing to be transmitted certain wire communications in interstate

and foreign commerce, for the purpose of executing the scheme.

### Object of the Conspiracy

11.     It was an object and purpose of the conspiracy that SCOTT N. POWERS and DAVID

E. McMASTER and their co-conspirators, by making and causing to be made materially false and

misleading representations and material omissions concerning the loans and the financial condition

4

of AMS, fraudulently would obtain and continue obtaining funding from BNC for AMS and would obtain personal benefits for SCOTT N. POWERS, DAVID E. McMASTER and their co-conspirators.

### Manner and Means of the Conspiracy

The conspirators employed various manner and means in furtherance of the conspiracy, including the following:

12.     It was a part of the conspiracy that SCOTT N. POWERS, DAVID E. McMASTER, and their co-conspirators fraudulently:

(a)     delayed sending pay down emails, which were routed through servers located in North Dakota, notifying BNC when specific loans were sold until funds were received from newly-sold loans;

(b)     used funds from newly-sold loans to make "lapping" payments for the earlier-sold loans listed in the pay down emails;

(c)     inflated the dollar amount in the pay down emails for the earlier-sold loans; and,

(d)     provided to BNC, in North Dakota and elsewhere, other false and misleading information about AMS' operations and financial condition.

### Use of "Lapping" Payments From New Loan Sales To Pay Down Earlier-Sold Loans

13.     It was further a part of the conspiracy that SCOTT N. POWERS, DAVID E. McMASTER, and their co-conspirators would delay sending pay down emails to BNC, until funds from new and recent sales had been obtained in amounts matching or closely approximating the amounts shown in the pay down emails for the earlier-sold loans. Pay down emails for the new and

recent loan sales then would be delayed until future "lapping" payments could be made from later sales.

14.     It was a part of the conspiracy that, at times, the pay down emails would be delayed until months after loans had been sold to investors, and that when BNC inquired as to why the older, "aged" loans had not sold, DAVID E. McMASTER would provide false and misleading explanations to BNC for the purported delays, when, in fact, as they well knew, the loans had already been sold to investors.

15.     It was a part of the conspiracy that DAVID E. McMASTER would draft the pay down emails, which requested that BNC pay down specific loans and in specific dollar amounts. DAVID E. McMASTER would then send the pay down emails for the earlier-sold loans to an AMS employee or to an employee of an AMS affiliate. At McMASTER's instruction, the employee would send the pay down emails from AMS in Arizona to BNC in Bismarck, North Dakota.

16.     The fraudulent pay down emails for earlier-sold loans included, for example, a pay down email sent on or about February 22, 2010 to BNC requesting BNC to pay down five specific loans in a total amount of $1,024,482.84, when the five loans reported in the pay down email had actually been earlier-sold in 2009. The email requesting the $1,024,482.84 pay down of the five earlier-sold loans was timed to match the amount of funds received that same day from the sale of six completely different loans. Sales of those six loans would not be reported to BNC by the time AMS closed in late April 2010.

17.     At times, generally when he was not available to monitor investor wires coming in from new loan sales, DAVID E. McMASTER would send to an AMS employee a list of "priority" pay downs, describing the order in which to pay down those loans in specific amounts based on the dollar amount of funds received from new sales and the balance in the purchase account.

**Falsely Inflated Dollar Amounts in Pay Down Emails**

18.     It was a part of the conspiracy that SCOTT N. POWERS, DAVID E. McMASTER and their co-conspirators, in order to further cover up undisclosed AMS losses on the sales of loans, to generate other false gains for AMS on the sales, and to create the appearance that AMS was operating successfully and selling loans at a profit, would also cause the pay down emails to show falsely inflated dollar amounts for the loan sales.

19.     The fraudulently inflated pay down emails included, for example, a pay down email sent on or about July 20, 2009 from Arizona to BNC in Bismarck, North Dakota requesting a pay down for a loan in the amount of $152,026.24, when that loan had been funded by BNC in the approximate amount of $141,000 and sold at a loss for approximately $132,026.24.

**Fraudulent Financial Information**

20.     It was further a part of the conspiracy, that SCOTT N. POWERS, DAVID E. McMASTER and their co-conspirators, in order to create the false appearance that AMS was operating successfully, that it was in compliance with its agreements and understandings with BNC, and that AMS had sufficient loans held for sale to repay the funds advanced by BNC and other amounts owed to BNC, fraudulently would cause other false information about AMS's operations and its financial condition to be provided to BNC, including a balance sheet which overstated AMS's cash-on-hand and an income statement which disguised under marketing and advertising expenses large monthly payments that AMS was making under an installment agreement with the IRS regarding a delinquency in unpaid payroll taxes.

(All in violation of Title 18, United States Code, Section 1349).

7

FORFEITURE ALLEGATION

The felony offense alleged in this Information, punishable by imprisonment for more than one year, is hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982(a)(2).

Upon conviction of an offense in violation of Title 18, United States Code, Section 1349, as alleged in this Information, SCOTT N. POWERS and DAVID E. McMASTER shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property, real or personal, constituting, or derived from, proceeds the defendants obtained directly or indirectly as a result of the violations.   This property includes, but is not limited to, the following:

- a money judgment of at least $28,564,470.46.

If any of the assets being subject to forfeiture pursuant to Title 18, United States Code, Section 982, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     have been transferred or sold to, or deposited with, a third party;

(c)     have been placed beyond the jurisdiction of the court;

(d)     have been substantially diminished in value; or

(e)     have been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeit substitute property pursuant to Title 21, United States

Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

TIMOTHY Q. PURDON
United States Attorney

DENIS J. McINERNEY
United States Department of Justice
Chief
Criminal Division, Fraud Section

BY: ROBERT ZINK
Trial Attorney
JACK B. PATRICK
Senior Litigation Counsel
Criminal Division, Fraud Section